IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PEGGY SUE KUMPF,

              Plaintiff,

       v.                                          Civil Action No. 2:08-CV-63

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.       Background

       Plaintiff, Peggy Sue Kumpf, (Claimant), filed a Complaint on May 2, 2008 seeking

Judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) of an adverse

decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed

his Answer on July 15, 2008.[2]  Claimant filed her Motion for Judgment on the Pleadings on

August 14, 2008.[3]  Commissioner filed his Motion for Summary Judgment on September 15,

2008.[4]  Claimant filed her Memorandum in Response to Commissioner's Motion for Summary

Judgment on September 25, 2008.[5]

---

[1] Docket No. 1.

[2] Docket No. 9.

[3] Docket No. 12.

[4] Docket No. 14.

[5] Docket No. 16.

B.      The Pleadings

      1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

      2.      Defendant's Brief in Support of Motion for Summary Judgment.

      3.      Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment.

C.      Recommendation

I recommend that:

      1.      Claimant's Motion for Summary Judgment be **GRANTED IN PART** and **DENIED IN PART**.  Claimant's motion should be granted solely on the issue of the ALJ's failure to re-contact Dr. Corder, and the case **REMANDED** with instructions that a consultative examination of Claimant be had to resolve the conflicting evidence surrounding her fibromyalgia.  Claimant's motion should be denied as to the following issues because the ALJ's decision was supported by substantial evidence: 1) The Decision of the Commissioner to Reject the Opinions of all the Treating Medical Providers; 2) The ALJ Failed to Properly Evaluate Claimant's Testimony Concerning Intensity, Duration and Limiting Effects of Her Symptoms of Pain; and 3) The ALJ Erred in Improperly Relying Upon the Vocational Expert's Responses to an Incomplete Hypothetical.

      2.      Commissioner's Motion for Summary Judgment be **GRANTED IN PART** and **DENIED IN PART** as set forth above.

## II.  Facts

A.      Procedural History

Claimant filed an application for Disability Insurance Benefits (DIB) benefits on March 6, 2003, alleging disability since February 21, 1998, due to osteoarthritis, fibromyalgia, and

spurs on the left knee and heel. (Tr. 57-59, 78). The claims were denied initially on June 23, 2003, and upon reconsideration on October 14, 2003. (Tr. 37-38). Claimant filed a written request for a hearing on November 24, 2003 (Tr. 48). Claimant's request was granted and a hearing was held on May 20, 2004. (Tr. 247-76).

The ALJ issued an unfavorable decision on September 3, 2004. (Tr. 14-25). The ALJ determined Claimant was not disabled under the Act because she could perform work that existed in significant numbers in the national economy. On September 15, 2004, Claimant filed a request for review of that determination. (Tr. 9). The request for review was denied by the Appeals Council on December 10, 2004. (Tr. 4-6). Therefore, on December 10, 2004, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.[6] On December 8, 2005, Magistrate Judge Kaull issued a Report and Recommendation recommending the case be remanded to the Social Security Commissioner for further administrative proceedings. (Tr. 308-47). On February 13, 2006, Judge Maxwell adopted Magistrate Judge Kaull's recommendation and remanded the case.

Pursuant to the remand order, the Appeals Council issued a notice of order remanding the matter to an ALJ for an administrative hearing, which was held on September 13, 2006. (Tr.

---

[6] During the pendency of her appeal, Claimant reapplied for DIB, alleging her continuing disability since July 15, 2002 and attributed it to depression, osteoarthritis, heel and knee spurs, fibromyalgia, hypertension, and gastroesophageal reflux disease. (Tr. 365-67, 385-86, 394). This claim has been consolidated with the remanded application. (Tr. 283).

725-55).  At the hearing, the alleged onset date was amended to October 1, 2001.  (Tr. 732).[7]

The ALJ issued his second unfavorable decision on October 30, 2007.  (Tr. 282-97).  Claimant

filed a request for review of that determination.  On March 4, 2008, the Appeals Council

considered Claimant's request, but found no reason to assume jurisdiction.  (Tr. 277-79).

Therefore, on March 4, 2008, the ALJ's decision became the final decision of the Commissioner.

B.    Personal History

        Claimant was born on February 1, 1961 and was forty-six years old as of the date of the

ALJ's most recent decision.  (Tr. 365).  Claimant was therefore considered a "younger person"

under the Commissioner's regulations.  20 C.F.R. § 404.1563(c) (2008).  Claimant completed

LPN school and two years of college.  (Tr. 84, 252).  Claimant has prior work experience as a

licensed practical nurse.  (Tr. 79).

C.    Medical History

        The following medical history is relevant to the disposition of the case:

**Davis Memorial Hospital, 12/9/1998, (Tr. 116-118)**
Bilateral Mammography - Benign breasts
Left knee swelling.  Study revealed Claimant's "deep venous system [was] patent and no DVT
[was] seen"

**Sally H. Swisher, M.D., 7/26/1999, 4/11/1996, (Tr. 119-121)**
Dr. Swisher wrote to Dr. Corder on July 26, 1999 explaining that she had seen Ms. Kumpf on
July 26 for neck and back pain.  Dr. Swisher gave Ms. Kumpf Vioxx to help the pain.

Dr. Swisher also wrote to Dr. Corder on April 11, 1996, outlining Ms. Kumpf's April 8, 1996
visit.  Ms. Kumpf had numbness and tingling in her hands with decreased grip strength.  She

---

[7] Claimant had coverage for a period of disability through December 31, 2006.  (Tr. 61,
75, 368, 394).  Therefore, in order to be entitled to DIB, Claimant bears the burden of showing
that she became disabled prior to December 31, 2006, the date on which her insured status
expired.  20 C.F.R. § 404.131(a) (2008); Blalock v. Richardson, 483 F.2d 773, 775 n.3 (4th Cir.
1972).

complained of depression and had been obese for most of her life. She had a positive Tinel's sign on the right over the right median nerve. Her nerve conduction studies were borderline. Clinical impression is that she has carpal tunnel syndrome, although her EMG is borderline.

**UHA Physicians Office, Dr. Riggs & Dr. Hornsby, 8/3/1998, 2/6/1999, 12/6/1999 (Tr. 122-137)**

On August 3, 1998, Claimant reported to the neurology department at University Health Associates and was examined by Jack E. Riggs, M.D. Claimant informed Dr. Riggs that she had been involved in an automobile accident on February 25, 1998. She stated she had noticed numbness on the right side of her body, facial weakness and numbness and numbness at the back of her neck since April, 1998. She stated she had "recently" experienced dizziness; difficulty "concentrating on her job," stumbling, blurred vision in the morning, elbow pain, knee pain, and weak grip. She informed Dr. Riggs that she had "trouble with tremors," which she attributed to "nervousness."

On August 7, 1998, Dr. Riggs corresponded with Dr. Corder about his August 3, 1998 evaluation of Claimant. He opined that her MRI showed "one small focus of white matter" which did not make him "suspect that this would be indicative of multiple sclerosis." Dr. Riggs further opined that Claimant had "no focal neurologic abnormalities or other neurologic findings that would suggest an underlying diagnosis of multiple sclerosis." Dr. Riggs informed Dr. Corder that the EMG study of Claimant "showed very minimal or borderline prolonged distal latency on the right median nerve." Dr. Riggs concluded the correspondence by writing that he "certainly would not suspect that [Claimant] had multiple sclerosis."

On February 6, 1999, Claimant was evaluated at UHA. She complained of pain and discomfort in her back and extremities; numbness and tingling in her neck, feet, and legs; blurred vision; tiredness; headaches; her arms giving out; stumbling; and occasional knee swelling.

On December 6, 1999, Claimant was evaluated by Dr. Hornsby to "rule out lupus." Claimant informed Dr. Hornsby that she experienced "pain all over mainly back, neck, arms & hands." Claimant did not present with swelling, but stated fatigue had increased during the past six (6) months. Her medications were noted as Aldomet 25mg, Vioxx 50mg, Prilosec 20mg, and Elavil 10mg. Dr. Hornsby's review of Claimant's systems revealed no rashes; occasional double vision, which "comes and goes"; and no diaphoresis. Dr. Hornsby found Claimant had "muscle and joint pain without evidence of inflammatory arthritis or clear diagnosis of lupus." Additionally, Dr. Hornsby found "no clear evidence of rheumatology disease" and could not "make a diagnosis of fibromyalgia," even though Claimant did not sleep well and presented with "a few tender points."

**Sharon Joseph, Ph.D., Mental Status Examination, 4/28/2003, (Tr. 138-141)**

On April 28, 2003, Sharon Joseph, Ph.D., a psychologist, completed a Mental Status Exam of Claimant. Claimant informed Ms. Joseph that she had received grades of A's and B's while in

high school.  She stated she had been employed as a certified nursing assistant and a licensed practical nurse.  Claimant stated she "organized and opened the Dementia Unit for Colonial Place, in Elkins, WV, and was the unit's coordinator until June 28, 2001, when she was replaced as coordinator by a registered nurse.  Claimant informed Ms. Joseph she "was very devastated by this, as she...had not [been] advised ahead of time that this would be the case."

In evaluating Claimant's mental status, Ms. Joseph observed her to be alert, oriented "x3," and cooperative.  Claimant stated her sleep was disturbed; her mood was depressed; and she had no suicidal and/or homicidal ideations, hallucinations, delusions, preoccupations, obsessions, or compulsions.  She presented with no limitations relative to her speech or hearing.  She stated she had difficulty walking long distances because of pain from fibromyalgia and difficulty with dexterity because of pain in her hands.  She informed Ms. Joseph she had difficulty standing for "any great length of time" because of pain and that arthritis caused swelling in her back and legs.


Ms. Joseph noted Claimant's motor activity was somewhat nervous, posture was appropriate, eye contact was average, language usage was normal, speaking speed was normal, and content of speech was relevant.  Ms. Joseph noted no psychomotor disturbances, a labile affective expression, and fair insight.  Claimant's judgment was within normal limits; Claimant's concentration was mildly impaired; and Claimant's immediate memory was within normal limits, recent memory was moderately impaired, and remote memory was within normal limits.

Claimant reported her activities of daily living were as follows: she rose at 6:45 a.m., walked dog, awoke her children, took children to school, cleaned house, completed laundry, cooked dinner, washed dishes, spent time with her family, and retired at 10:00 p.m.  More specifically, she stated she cooked meals, cleaned the bathroom, made the bed, vacuumed with frequent stops, took out garbage, drove a car, generally remembered to turn off the stove, walked stairs with difficulty, shopped for groceries if another carried her purchases, but lacked "desire and energy to do much during the day" because of depression.  She reported she attended church three (3) or four (4) times per week, read, spent time with her family, but no longer made craft objects because of lack of interest and arthritis and fibromyalgia pain.

Ms. Joseph diagnosed the following: 1) Axis I - major depression, recurrent, moderate pain disorder with physical and psychological features; 2) Axis II - deferred; 3) Axis III - fibromyalgia, osteoarthritis, hypertension, gastro esophageal reflux disease (GERD), spurs on right knee and heel as per Claimant's report.  Claimant's psychological prognosis, according to Ms. Joseph, was "fair to good with psychotherapy and psychiatric treatment for depression."  It was noted that she could manage her benefits.

**WV DDS, Kip Beard, M.D., Internal Medicine Examination, 5/7/2003, (Tr. 142-147)**

On May 7, 2003, Claimant underwent an Internal Medicine Examination.  Her chief complaints were for osteoarthritis, fibromyalgia, left knee pain, heel pain, and hypertension.  Dr. Beard's physical exam of Claimant revealed she was five feet, five inches tall and weighed 313 lbs.  Her blood pressure was 138/96.  He noted she was moderately to severely obese, stood unassisted, ambulated with normal gait, experienced a mild degree of difficulty when stepping up or down

from the exam table, was comfortable when seated, experienced mild discomfort in her back while in supine position, spoke understandably, and heard and followed instructions without difficulty.

Claimant's head, ears, neck, throat, chest, heart, and abdomen were normal. Trace lower extremity edema was noted by Dr. Beard in his exam of Claimant's extremities, but it was without stasis, pigmentation, ulceration, or significant varicosities. Claimant's cervical spine exam revealed "some pain with range of motion testing, some paravertebral tenderness without spasm" and normal flexion. Her extension was 45 degrees, lateral bending was 40 degrees bilaterally, and her rotation was normal. Her arms were tender, but her shoulders, elbows, and wrists were without redness, warmth, or swelling. Her shoulder, elbow, and wrist ranges of motion were normal. Dr. Beard observed "some positive trigger points in the arms around the shoulder girdle and neck." Her hands, ankles, and feet were normal. Dr. Beard opined that her knees revealed tenderness, genu valgus deformity, and moderate patellar crepitations. He observed no redness, warmth, swelling, effusion, or laxity of them. Flexion of both knees was 95 degrees and extension was normal. Dr. Beard's exam of Claimant's spine and hips revealed mild pain with range of motion testing, paravertebral tenderness, and no spasms of the dorsolumbar spine. Her seated straight-leg test was normal and supine was 75 degrees with back pain on either side. Her hip flexion was 90 degrees on the right and 95 degrees on the left without tenderness. Her neurologic examination was unremarkable except for the presence of a mildly positive Tinel's sign at the wrist. She was able to heel walk with pain, able to toe walk, able to heel-to-toe walk, able to squat halfway, and able to rise from a squat with some difficulty.

Dr. Beard's impression was for fibromyalgia, by history; hypertension; chronic neck and back pain; chronic cervical and lumbar myofascal pain; bilateral knee pain with possible osteoarthritis and patellar subfluxation; and exogenous obesity. In summary, Dr. Beard opined Claimant's necl and back revealed "some mild motion loss, tenderness and pain with range of motion testing"; reflexes appeared symmetric; and knees revealed "some moderate patellar crepitations, genu valgus deformity and diminished flexion."

The May 7, 2003 x-ray of Claimant's lumbar spine showed normal alignment of the lumbar spine, no compression fracture or subfluxation, normal interspaces and slight osteoarthritic changes of L1 and L2. The x-ray of her left knee revealed a slight narrowing of the medial compartment, a marginal lipping of the lateral epicondyle of the femur, and moderate degenerative arthrosis of the knee.

**Frank Roman, Ed.D., Psychiatric Review Technique, 5/13/2003, (Tr. 148-162)**
On May 13, 2003, Frank D. Roman, Ed.D., completed a Psychiatric Review Technique form of Claimant. Mr. Roman found she suffered from affective disorders, a medical impairment that was not severe. The affective disorder listed was depression, which was secondary to pain. Mr. Roman found Claimant was mildly limited in her activities of daily living, able to maintain social functioning, and able to maintain concentration, persistence, or pace. Mr. Roman found Claimant had experienced no episodes of decompensation.

**Physical RFC, Fulvio Franyutti, M.D., 5/22/2003 (Tr. 165-172)**

On May 22, 2003, Fulvio Franyutti, M.D., a state agency physician, reviewed the medical evidence of record and completed a Physical Residual Functional Capacity Assessment of Claimant. He found she could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of at least two (2) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited. Dr. Franyutti found Claimant should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. Claimant was found to have no manipulative, visual or communicative limitations. Dr. Franyutti found Claimant should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and hazards; should avoid all exposure to heights; and was unlimited in her exposure to extreme heat, wetness, humidity, noise and vibrations.

**Tucker Community Care, 7/4/2003 (Tr. 173-180)**

On July 4, 2003, Claimant reported to Tucker Community Care with complaints of chest pain, with nausea, which radiated out over her upper chest and back and which lasted for fifteen (15) to twenty (20) minutes. Her neck, respiratory system, cardiovascular system, abdomen, skin, extremities, and neurological/psychological systems were unremarkable. The emergent care physician's impression was for atypical chest pain. Her blood pressure was 132/81. Nitroglycerin was administered. Her electrocardiogram was borderline. Her chest x-ray was unremarkable. She was released with the following instructions: 1) activities as tolerated; 2) follow American Heart Association diet; 3) follow up examination by Dr. Corder within one (1) week; and 4) take Advil 800mg twice daily, Flexeril 10mg three (3) times per day, Tenormin 50mg once per day, Spirolactone 25mg once per day, Nexium 40mg at bedtime, Elevil 25mg at bedtime, and Zoloft 100mg once per day.

**Mason Corder, D.O., 3/26/99, 4/27/99, 7/7/99, 7/28/99, 10/13/99, 10/26/00, 3/16/01, 3/30/01, 6/26/01, 7/20/01, 8/20/01, 9/15/01, 10/15/01, 12/14/01, 3/8/02, 5/6/02, 1/15/03, 6/9/03, 7/14/03, 7/24/03, 8/20/03, 8/25/03, 3/5/04, 5/18/04 (Tr. 184-205, 244-245)**

On March 26, 1999, Dr. Corder examined Claimant, who stated her "feet, back and legs hurt" and that she felt numbness. He assessed multiple myalgias and paresthesias.

On April 27, 1999, Claimant was examined by Dr. Corder. Her lungs were clear, heart rage and rhythm were regular, blood pressure was 120/70, and upper and lower extremity reflexes were equal and symmetrical. She presented with "episodes of migratory paresthesias, no muscle weakness." Dr. Corder diagnosed paresthesias and neuropathy (questionable etiology) and possible MS and prescribed Prednisone and Neurontin.

On July 7, 1999, Joseph Steffl, physician assistant to Dr. Corder, examined Claimant. Her weight was 280 lbs; blood pressure was 140/90; EKG showed normal sinus rhythm; ENT was within normal limits; extremities were without edema and cyanosis; upper and lower extremity pulses were present and equal; sensation was intact; no muscle weaknesses in upper or lower extremities; and no muscle atrophy. She stated the prescribed Neuronton was "helping the lower extremities," but that she experienced paresthesias in her upper extremities. She informed P.A.

Steffl that she had difficulty lifting and pulling her patients sometimes and that she was experiencing weakness within her hands. She also stated she was pain free and not experiencing any difficulties with her hands. P.A. Steffl diagnosed possible continuation of carpal tunnel "versus questionable etiology of MS with paresthesias and neuropathy." P.A. Steffl recommended she undergo a consultative exam by Dr. Swisher.

On July 28, 1999, Claimant was examined by Dr. Corder, who reported she presented with no weakness, no rash, but continued neuropathy.

On October 13, 1999, Claimant returned to Dr. Corder for an employment physical. She reported that she had been having some swelling. Dr. Corder continued her prescriptions for Neurontin and Vioxx.

On October 26, 2000, Claimant returned to Dr. Corder for a follow up examination. She stated she experienced arm numbness and weakness.

On March 16, 2001 Claimant presented to Dr. Corder with pain in both legs, back pain, and spider bites. Dr. Corder observed she had right leg pain, sciatic pain in left leg, back pain, and "slight calf edema."

On March 30, 2001, Claimant returned to Dr. Corder as a follow-up. Dr. Corder opined Claimant continued to experience back and leg pain and noted she had been sleeping "better" with the "addition to Flexeril" to her medication regimen. Dr. Corder assessed "resolved" spider bites, low back pain, fibromyalgia, and mild calf edema. Dr. Corder recommended stretching exercises for her low back, waling, and that she join a fibromyalgia support group. He prescribed Vioxx and Flexeril.

On June 26, 2001, Claimant was again examined by Dr. Corder for complaints of bone spur and leg swelling. She informed Dr. Corder that her "leg didn't want to work"; that she had reported to the "Tucker Co. Amb. Center" for treatment of her leg; and that an x-ray had been taken during that visit that revealed bone spurs. Her blood pressure was 160/102 and hew weight was 325 lbs. She was diagnosed with "+1 - +2 pitting edema in both lower legs," job stress, anxiety, hypertension, and obesity. Dr., Corder ordered lab testing, provided a Zpack, prescribed Vistaril and discussed weight loss with Claimant.

On July 20, 2001, Claimant returned to Dr. Corder with complaints of depression. She stated she felt "hopeless, tearful," her desire to sleep had increased, and her former employer had been "fighting her on unemployment." She denied suicidal or homicidal ideations. Dr. Corder observed that she held direct eye contact, was insightful, and tearful at times. She completed a questionnaire on which she noted the following: she 1) felt best in the mornings, enjoyed talking to or looking at or being with attractive women/men, was constipated, had a clear mind, found it easy to do the things she used to do, felt hopeful about the future, found it easy to make decisions, felt useful and needed, felt her life was pretty full, and still enjoyed the things she used to none of the time; 2) was restless and felt that others would be better off if she were dead some of the time; 3) had trouble sleeping through the night a good part of the time; and 4) felt

downhearted and blue, had crying spells, ate as much as she used to, got tired for no reason, and was more irritable most of the time. Based on the responses to these questions, her statements to Dr. Corder, and his observation of Claimant, Dr. Corder diagnosed severe depression and situational anxiety. He discussed counseling options with her, prescribed Wellbutrin and Vistaril, and advised Claimant to return in one (1) month.

On August 20, 2001, Claimant presented to Dr. Corder with low back pain and urinary spasm and burning. She informed him that the antidepressant he had prescribed was "helping some." Her blood pressure was 158/100. Dr. Corder assessed the urinary tract infection, uncontrolled hypertension, and depression under treatment with medication. He prescribed Macrobid 100mg and Wellbutrin, which was increased to 150mg.

On September 15, 2001, Claimant was examined by Dr. Corder. Her blood pressure was 160/80. He assessed uncontrolled hypertension and hematuria. He prescribed Tenormin 50mg for her hypertension and ordered her urine to be recultured.

On October 15, 2001, Claimant presented with restless legs and depression to Dr. Corder. Her blood pressure was 130/90; she stated she was stressed at home; and she informed Dr. Corder the Wellbutrin was "not working." He observed her affect to be flat and that she was "tearful at times." He assessed hypertension, borderline controlled; depression; and restless legs. He prescribed Zoloft, recommended she begin taking vitamin B, and instructed her to return in six (6) weeks or sooner, if necessary.

On December 14, 2001, Claimant returned to Dr. Corder with complaints of low back and side pain and burning with urination. Her blood pressure was 120/78, she made direct eye contact, and she was not tearful. He assessed depression and urinary tract infection. He continued her medications and instructed her to return in three (3) months.

On March 8, 2002, Claimant did not attend an appointment with Dr. Corder. She returned on May 6, 2002, with complaints of congestion, ear pain, and low back pain. Her blood pressure was 120/80. Dr. Corder observed Claimant's nasal mucus was inflamed, her post nasal drip was "yellow," her neck was supple, and hematuria in her urine. He diagnosed sinusitis and urinary tract infection, prescribed Allegra, and provided samples of Avelox.

On January 15, 2003, Claimant presented to Dr. Corder with complaints of aching "all the time." She reported she thought she had had a panic attack and was more depressed. Her blood pressure was 140/82 and her weight was 322 lbs. Dr. Corder noted she had back pain, leg pain, and stiff arms and could walk for short distances. He assessed fibromyalgia and hypertension and increased her intake of Zoloft to 100mg from 30mg.

On June 9, 2003, Claimant reported to Dr. Corder that she had been ill for three (3) days. Dr. Corder observed inflamed nasal mucus and infected pharynx and diagnosed pharyngitis. He prescribed Keflex 500mg.

On July 14, 2003, Claimant was examined by Dr. Corder as a follow-up to her discharge from Tucker Community Care. Her blood pressure was 130/80. His assessment was for hair loss, chest pain and GERD.

On July 24, 2003, Dr. Corder completed a Medical Assessment of Ability to do Work-Related Activities (Physical) of Claimant. He found her ability to lift and carry was affected by her pain, stiff knees, low back pain, knees giving out, and falling. Dr. Corder found Claimant could lift and carry five (5) pounds for one (1) hour per day. He opined her ability to stand and walk was affected by her back pain and that she could stand and walk for one (1) hour in an eight (8) hour workday for thirty (30) minutes without interruption. He found her ability to sit was affected by her back pain and that she could sit for one (1) hour in an eight (8) hour workday for thirty (30) minutes without interruption. He opined she could never climb, balance, stoop, kneel, or crawl due to back pain, morbid obesity, and knee pain. Because of her hand stiffness and pain, Dr. Corder found her ability to reach, handle, feel, push, and pull were affected, and he based this finding on his diagnosis of arthritis and fibromyalgia. Dr. Corder also found Claimant was restricted as to heights, moving machinery, humidity, and vibrations because she could not tolerate heat. In support of his assessment of Claimant's abilities and limitations, Dr. Corder noted the following as medical findings: 1) legs swelling; 2) leg pain; 3) hypertension; 4) cardiovascular disease; 5) obesity; and 6) knee pain.

Claimant was examined by Dr. Corder on August 20, 2003. Her blood pressure was 132/80 and her weight was 309.5 lbs. She stated she had experienced stomach queasiness and difficulty sitting for more than one (1) hour. Dr. Corder observed Claimant was morbidly obese, had hand stiffness, and presented with multiple myalgias. Dr. Corder diagnosed fibromyalgia and ordered a gynecological exam.

On August 25, 2003, Claimant underwent a gynecological test. Her blood pressure was 130/80 and her weight was 309 lbs. The examining physician opined Claimant appeared healthy; her neck was supple, her lungs were clear; her musculoskeletal range of motion was fully active; and her neurological system was grossly intact.

On March 5, 2004, Dr. Corder made a notation on a prescription form that Claimant was unable to work.

On May 18, 2004, Dr. Corder authored a letter, addressed "To Whom This May Concern," relative to Claimant's ability to work. He wrote that she was "unable to work due to chronic pain and depression." He wrote she had "multiple complaints" of severe depression since 1996, she had experienced minimal positive results of the prescribed medications, and "it was impossible for her to work very long as a nurse due to the stress of the job." Dr. Corder also wrote that Claimant's chronic pain was caused by fibromyalgia, which responded minimally to injection and medication. Dr. Corder listed her other illnesses as hypertension, morbid obesity, generalized affective disorder, asthmatic bronchitis, and patellofemoral syndrome.

**Thomas Lauderman, D.O. Physical RFC, 10/3/2003 (Tr. 206-213)**

On October 3, 2003, Thomas Lauderman, D.O., a state agency physician, completed a Physical RFC Assessment of Claimant. He found she could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk for at least two (2) hours in an eight (8) hour workday, sit for a total of about six (6) hours in an eight (8) hour workday, and push/pull unlimited. Dr. Lauderman found she could never climb ramps, stairs, ladders, ropes, or scaffolds. He opined Claimant could occasionally balance, stoop, kneel, crouch, and crawl. She was found to have no manipulative, visual, or communicative limitations. Dr. Lauderman found Claimant should avoid all exposure to hazards, should avoid concentrated exposure to extreme cold and heat, and could withstand unlimited exposure to wetness, humidity, noise, vibrations, fumes, odors, dusts, gases, and poor ventilation. Dr. Lauderman reduced Claimant's RFC to sedentary exertional level.

**Robert Marinelli, Ed.D., Psychiatric Review Technique, 10/7/2003, (Tr. 214-227)**

On October 7, 2003, Robert Marinell, Ed.D., completed a Psychiatric Review Technique of Claimant. Mr. Marinelli found Claimant had impairments, namely affective disorders and anxiety-related disorders, which were not severe. Mr. Marinelly found her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace were mildly affected by her impairments. He noted Claimant had never experienced an episode of decompensation.

**Dilip Chandran, M.D., Appalachian Community Health Center 11/18/03-3/9/04, (Tr. 232-239)**

On February 10, 2004, Dilip Chandran, M.D., completed a Comprehensive Psychiatric Evaluation of Claimant. Her chief complaint was depression. Claimant stated her depressive symptoms included "anergia, amotivation, crying spells, anhedonia, feelings of helplessness, hopelessness," and guilt. She informed Dr. Chandran she had had "about four to five" panic attacks in the past year. She stated she was supported by her husband; her parents offered "good support to her"; and she was "supported by members of the church."

Dr. Chandran observed Claimant to be alert, oriented, in no acute distress, obese, hygienic, pleasant, and cooperative. He noted Claimant's speech was clear and coherent; she had not experienced hallucinations; her mood was depressed; her affect was downcast; her memory was intact; her concentration was intact; and her insight and judgment were fair. Dr. Chandran assessed the following: 1) Axis I - major depressive disorder, moderate, recurrent; 2) Axis II - none; 3) Axis III - fibromyalgia, hypertension, osteoarthritis; 4) Axis IV - medical stressors and family members' illnesses; and 5) GAF - sixty (60) percent. Dr. Chandran increased Claimant's dosage of Zoloft to 200mg, encouraged her to continue with therapy, and instructed her to return in one (1) month.

On March 9, 2004, Dr. Chandran evaluated Claimant. Claimant reported she was "seeing no improvement on the increased dose of Zoloft"; her mood continued as one (1) on a scale of ten (10); she continued to be amotivational; her crying spells continued; she had difficulty sleeping; her feelings of helplessness, hopelessness, and guilt continued; her appetite remained stable; and

she experienced difficulty initiating and completing sustained or complex tasks. Dr. Chandran noted her mood was depressed and her affect was downcast. His assessment was as follows: 1) Axis I - major depressive disorder, moderate, recurrent; 2) Axis III - fibromyalgia, hypertension, and osteoarthritis. Dr. Chandran prescribed Paxil, recommended Claimant seek therapy weekly, recommended she volunteer "at a low stressful institution" as a way of providing "structure in her day and to keep her mind occupied," and instructed her to return to his care in four (4) weeks.

**Lisa Wamsley, B.S. , Appalachian Community Health Center, 11/18/2003, (Tr. 240-243)**
On November 18, 2003, Claimant reported to the Appalachian Community Health Center for treatment of depression and anxiety. She was evaluated by Lisa Wamsley, B.S., of the admissions/crisis staff. Claimant stated she had been diagnosed with fibromyalgia in 1999, had experienced symptoms "long before that," could not "sit, stand or lift" because of fibromyalgia, and was unable to work because she could no longer lift heavy objects and stand for extended periods of time. Claimant stated she had been depressed for the past ten years and had been provided medication for depression by her physicians. She reported her depression manifested itself as follows: her having 1) become "upset and tearful over little things"; 2) become "tearful watching television"; 3) poor concentration and memory; 4) loss of interest in hobbies and home life; 5) lack of interest in doing "things" with her children; 6) poor energy level; 7) feelings of guilty and worthlessness; 8) become more withdrawn in the past six (6) months; 9) increased need for sleep and napping; 10) experienced an increase in anxiety attacks; 11) a fear of answering the telephone because she may miscommunicate or forget a message; 12) worried about her daughter having been diagnosed with schizophrenia; and 13) increased feelings of anger. Claimant informed Ms. Wamsley that she had worked as a certified nurse's assistant and licensed practical nurse until 2001, when she was fired from Colonial Place. During her evaluation, Claimant maintained eye contact and was friendly. She stated she slept approximately seven (7) hours per night, but, because of interruption to her sleep caused by pain, she actually slept three (3) hours. She reported a good appetite; denied any suicidal or homicidal ideations, hallucinations, or delusions; described her mood as "usually depressed"; experienced feelings of dread; experienced poor short term memory; and possessed an in tact long term memory. Ms. Wamsley noted Claimant's affect was flat. Ms. Wamsley diagnosed the following: 1) Axis I - major depressive disorder, recurrent without psychotic features (primary) and generalized anxiety disorder (secondary); 2) Axis IV - no social support; and 3) Axis V - GAF 55. Ms. Wamsley opined Claimant needed to "identify and learn appropriate ways to improve mood and decrease depressive episodes and follow through with doctor recommendations."

D.    Testimonial Evidence

Testimony was taken at hearings held on May 20, 2004 and September 13, 2006. The

following portions of the testimony are relevant to the disposition of the case:

MAY 20, 2004 HEARING

Q        Okay.  All right.  Did you last work in July of 2001?

A        Yes.

Q        Where were you working at that time?

A        I was working and then - - Colonial Place and that's an assisted living.

Q        Okay.  How long were you working there?

A        I worked there two years.

Q        What was your position?

A        I was a working supervisor for the dementia unit.

Q        Okay.  What did that require you to do?

A        That required more hands on work with the residents.  We - - I helped with baths, helped moving and transporting patients, got them ready for doctor's appointments, took care of all the paperwork for that, as well as do treatments and pass medications.

Q        Okay.  And prior to that it appears you worked at Courtland [phonetic] Acres. That was a nursing home.

A        Yes.

Q        For about eight years.

A        Yes.

Q        And what were your duties there?

A        Again, I was working supervisor there too.  We had more residents.  I only - - almost never got to sit down because of passing out medication, doing treatments, supervising the other staff and - -

ALJ        Were your - - those two jobs basically the same?

CLMT        Yes, sir.

ALJ         Different places, but the same kind of duties?

CLMT        Yes.  Um-hum.

BY ATTORNEY:

Q       And then in the past, basically in the past 15 years has your work been in this

field?

A       Yes, I've always worked as a nurse.

Q       Okay.  And the duties on all of your jobs in the past 15 years have basically been

the same?

A       Yes.

Q       Okay.  Why did you stop working in July of 2001?

A       I was having increased pain all over.  I went through a lot of testing.  They found

it was fibromyalgia, and I also have osteoarthritis and three spurs on my left knee and on my heel

I have a spur.  I have bouts of fasciitis.  I also have depression, deep depression, and I take

medication for that and counseling.

ALJ         Well, excuse me a second.

CLMT        Yes.

ALJ         You have - - I have your onset date for when you say you became

disabled.

CLMT        Yes.

ALJ         I have it here as February 21, 1998.  How is that - - you worked until

2001.  How could you have been disabled in 1998?

CLMT        Well, I was just - - I had this disease and they just didn't know what it was for several years and I was - -

ALJ        But you were able to work?

CLMT        Yes, sir, I was able.

ATTY        We need to amend that.

*         *         *

ATTY        Okay.

CLMT        I was able to until - - - it just seems like it's progressively gotten worse. And my hands, I would start dropping things with them.  It - - I didn't have the grip I normally had, which was bad because you know with patients, I worked in a dementia unit so you had to deal with them more tenderly than you do with someone else.

ALJ        All right.  Go ahead.

ATTY        Who diagnosed the fibromyalgia?

CLMT        Dr. Porter [phonetic].

ATTY        Is he your treating doctor?

CLMT        Yes.

ALJ        Does he speak English?

CLMT        Yes.

ALJ        Because the reports you just gave me looks like it was composed by an illiterate, frankly.

BY ATTORNEY:

Q     And how long has he been your doctor?

A       Since '96.

Q       And as far as you were saying earlier, that you have problems with your hands, was any test ever performed to confirm that?

A       Yes.  I had early carpal tunnel several years ago when I was working in Portland.  And also the fibromyalgia, he's given me injections in my hands to help with the pain, cortisone shots; and it hasn't helped much.  And he's got me on medicine for muscle spasms, too, because my hands and body does have a lot of spasms.

Q       The fibromyalgia that you have where do you have the pain from this condition?

A       I have it in my back and my legs, both legs and my hands up to my shoulders, in my left hand and in my right hand and elbow.  And I - - sometimes if I stand for any period of time I'll get so sick in my stomach from the pain that I feel like I'm going to throw up.  I sweat profusely, too.  I think it's a combination of medications and just the pain itself.

Q       With your standing ability how long can you stand at one time?

A       About ten to 15 minutes before it gets unbearable.

Q       What starts to bother you the most after that amount of time?

A       My back, it hurts really bad, the small of my back and then my legs get to hurting bad.

Q       I see you're taking medication for swelling?

A       Yes.

Q       Where do you have the swelling?

A       I have it in my hands and in my legs and feet.

*               *               *

Q       Okay.  How about just sitting?  Do you have any problem just sitting?

A       Yes, I do.  My back hurts and my neck hurts and my legs cramp too.  I have to frequently move them around too.

Q       How long can you sit before those things will start to aggravate?

A       About a half an hour.

Q       And what about lifting things?  What do you feel you can lift without a problem?

A       Not over five pounds.

ALJ        You can't lift anymore than five pounds?

CLMT       Yes, sir.

*              *              *

BY ATTORNEY:

Q       How often do you have the pain that you indicated, you've indicated the areas you have the pain?  How often do you have pain?

A       I have it all the time.

Q       How do you sleep at nighttime?

A       I don't.   The doctor has given me Elavil for bedtime for the pain and to help me sleep with the fibromyalgia, but I toss and turn.  I probably switch positions, ten, 12 times a night.  And I had, unfortunately since they've put me on this new medication for my depression I kick and scream out from the pain and nightmares.

*              *              *

Q       How are you spending your time most days?

A       Well, I don't - - I'm not able to run the sweeper in the house so usually I try to

run a load of clothes and dry them and put them away.  I have a lot of hard time with stairs and it takes me a long time to do things.  I'm a lot slower.  I used to be able to whiz through, you know, and have everything done and work and I didn't have any problems.  Now it's a problem just to get the housework done.  My daughter has to help me a lot and - -

Q      All right.  Do you watch TV?  Do you - - what - - how do you entertain yourself?

A      Well, I read from the Bible and do prayer.  I do watch some TV, but I have to get up and walk around the house.  And - -

Q      Do you lie down or - -

A      Yes.

Q      - - nap during the day?

A      Yes, I take several naps a day.

Q      How much?

A      About probably three naps a day.

Q      For how long?

A      For an hour at a time.

Q      Okay.  How about your ability to just say walking on level ground?

A      I have a rough time.  I have - - I've been falling frequently, just for no reason. We have carpeting downstairs and hardwood upstairs, but I stumble frequently.  Just a couple - - my last week I fell and tore all the skin off of my toe - - my toenail off.  It's - -

Q      Do you know what's causing you to - - for that to happen?

A      They say it's the fibromyalgia and just - - I don't get dizzy or anything.  I just all at once just stumble.

Q       What types of treatment have you had on the fibromyalgia?

A       I've don't exercise and the pain is so bad I can't - - I've tried walking.  I can't walk very far without getting the nausea and the increased pain.  I've tried diet too.  We got - - one of the - - Dr. Barry [phonetic] had suggested I try the different diets that fibromyalgia has out.  I checked that book out of the library.  I tried it for awhile and it just didn't - - I didn't see any change.  I've tried lematin, sweets [phonetic], and things that do cause - - they think causes the outbreaks, but my just doesn't seem to go in remission.  I don't know why.

Q       And what medications are prescribed for it?

A       For the fibromyalgia I take Flexeril, 10 milligrams three times a day and I take Bextra, 20 milligrams everyday.  I take Elavil, 25 at bedtime.    And I also have to substitute Motrin and Tylenol during the day if I have more pain.

*                *                *

Q       Okay.  What other physical problems does Dr. Porter treat you for?  We've talked about your fibromyalgia and then you had mentioned other problems.

A       Yes.  I have osteoarthritis in both of my knees, my left being worse.  It has three spurs in the joints on it too.  And the left foot, I have a big heel spur and I have outbreaks of phacitis inflammation on it.

Q       How often?

A       Oh, maybe every two months if I, you know, do walk.

Q       How is that - - what happens when that happens?

A       It's extreme pain.  It gets red.  I have to tape it up.

Q       How long is it like that?

A       About a week, and it's really painful if you step on it or anything.

Q       Is there any other treatment for that bedside what you just described?

A       Rest and elevation.

Q       And how long has - - you say that it happens how often, that problem?

A       About every two months, usually the rest and the taping it will help.

Q       Okay.  Now with your knees has there been any recommended treatment for your knees at this time?

A       Dr. Tool [phonetic] in Albemarle [phonetic] saw me several years back and he said I'll eventually have to have total knees done on both knees.

Q       When did you have the pain in your knees?

A       All the time, usually when I'm up on them it really hurts worse, or if I'm walking.

*               *               *

Q       Okay.  Now who is treating you for - - you mentioned earlier your depression?

A       I see Dr. Barry and Dr. Chandra [phonetic] and I also have a therapist, Kitty Kerns [phonetic] is my therapist that I see every two weeks.  And I see Dr. Barry and Dr. Chandra every month and then my caseworker, Larry, as needed.

Q       Okay.  And as far as your depression goes how does your depression, in your opinion, affect your life as far, as lets say your daily functions, taking care of your personal needs, taking care of your home?  You've kind of touched on that already, but - -

A       It's - - it affects me a lot.  I don't concentrate as well as I used to.   My mind just wonders.  I have to - - if I go in the room to do something I'll have to think, oh, what did I come in here for.  I'll end up having to write things down a lot.  I cry just for no reason and if there's

something sad on TV or something I cry.  And I don't sleep well at night.  I was on Zoloft, but they had the maximum of 200 a day and it just wasn't doing anything and so they changed me over to this.  Through the years I've been on and off different anti-depressants.

Q       Okay.  With your, you said the crying episodes - -

A       Um-hum.

Q       - - how often are they occurring?

A       About three days a week, three times a week.  It used to be everyday, but it's - - and if the situation, if there's something that's - - and that's why I don't handle things like I used to.  Used to I could supervise several people, pass out medication, get around every - - all the patients and everything.  And it's just - - it's depressing because I've done nursing all my life.

Q       What do you - - do you know what's caused your depression?

A       I think from all the pain and limitations of the fibromyalgia and the arthritis, I think all that had something to do with it.  Plus, fibromyalgia, the doctor said, also carries depression with it.

Q       What about social activities, how have they changed if they have?

A       Yes, they've changed.  I used to do a lot of things with our church.  And my husband being a minister, a lot of the things that ladies will get together and do when they - - we go on the trips.  I haven't been to go on them, like an annual ladies assembly, and I haven't been able to go to that for the last two years.  And this will be the third year.  And I don't get to - - a chance to go on mission trips.  I don't get to participate as much in the fellowship meetings that they have.  And sometimes if I don't feel right I don't get to go to church.  And I have to force myself to be able to go on Sundays.  I love it.  I love to go, but to sit and have the pain it affects

you a lot.

Q    Okay.  what about activities besides events like that that you - -

A    I don't get to do much with my children.  I really feel bad about that because when I worked I did do several things, but as this has progressed with pain - - they like to go fishing and ball games and stuff like that.  And a lot of things I just don't go because I can't walk, you know, a long distance.  It's like my daughter is getting ready to move up into high school in the fall and we went to a thing for her, for move up day and we didn't have much walking at all.  I had to stop and wait and just broke out in a sweat all over and I tried not to embarrass her, but you know, it's hard.

Q    Is there anything else about your physical or mental condition that you would like to say?

A    I just, I feel really bad because the only thing I've ever known to do has been nursing and that was my career.  Now I don't have it.  I'm sorry.  I've had to turn down two job offers since  I've had this in the last three years.  One of them was for [INAUDIBLE] an hour and I just, I had to turn them down.   But I think more than anything I just enjoyed doing it.  I liked working and being out among the people and seeing people.  It's just - -

Q    Do you feel that you could do any other type of work besides the nursing?

A    I've tried to think of something I could do.  I even thought maybe I could do an office type job if I could find one, but with my hands cramping up and my writing being very non-legible it makes it very hard.  And plus the pain that I have I'd have to move around a lot. There's not many employers that will let you get up and do that.  I just don't see - - I wish there was something I could do.  I don't see anything and I've spoke with my therapist about it and the

psychiatrist and he - - they can't think of anything either that - - even the volunteering they recommend maybe I could do that; but I can't because of the pain and limitations.

ATTY          Okay.  Thank you.

                              *              *              *

ALJ          And have you had an opportunity to review the vocational aspects of the file?

VE          Yes.

ALJ          Is there any other information about the Claimant's past work that you would need?

VE          There is something - - conflicting information in the file, Your Honor, regarding her work history that perhaps I need to clarify.

ALJ          All right.

VE          When I reviewed the file it indicated that from July of 1999 until June of '02 you worked as an LPN and it indicated in an MD office.

CLMT          Oh, yes, I worked - -

VE          You had two jobs at one time then?

CLMT          Yes, while I was working a Colonial Place, I worked for Dr. Gainer [phonetic].  And when I left Colonial Place I thought I might be able to work, you know, in a doctor's office.  And I also worked for Dr. Hummer [phonetic], and both of them are husband and wife doctors.

VE          Okay.  So you worked part time for those as an LPN essentially, or medical assistant for these doctors - -

CLMT        Um-hum.  Yes.

VE          - - up until June of '02?

CLMT        Yes, sir.

VE          And that was in addition to working from October of '99 to June - - well,

July of 2001 as the demential coordinator - -

CLMT        Um-hum.

VE          - - as you clarified.

CLMT        Yes.

VE          That helps clarify, Your Honor.

CLMT        But I - -

ALJ         She said - - you said before you last worked in July of 2001.

CLMT        Yeah, that - -

ALJ         Didn't you say that?

CLMT        Yeah.  I must have - - as of 2001.  That's what I thought.

ALJ         And you - - but now you just said you worked until June of 2002.

CLMT        Oh.

VE          Well, I don't think she said that.  In the file it indicated that.

ALJ         The file - - well, did you?

CLMT        Yes, I worked for the doctors' offices in 2002.

ALJ         Into 2002?

CLMT        Yes, but I worked - -

ALJ         Well, what were you making a month there roughly?

CLMT        I was making $8.50 an hour, but I was only working fill in.  I - -

ALJ          How many hours?

CLMT        It varied.  Usually, in the summer - - now Dr. Hummers, I worked almost

a month there, off and on, but I   just couldn't keep up with so I went back to Dr. Tony and Dr.

Gainer on a PRN basis.   And the last time I worked for them was in July of 2001.  I just - - or

2002.  I'm sorry.

ALJ          2002.

CLMT        Yeah.

ALJ          All right.  Hold on.

CLMT        I worked one day for them that year.

ATTY        It doesn't show any earnings for 2002.

ALJ          That's what I'm looking for.

ATTY        Yeah.

ALJ          Why doesn't your record reflect any earning for 2002?

CLMT        I thought - - maybe it was 2001.

WTN          As far as I know you worked one day after July of 2001.

CLMT        Just - -

WTN          That was one day that - - after the Colonial Place you worked.  And when

she's showing that she worked these other places while she was at Colonial Place, I think that

you're looking at, she might have, in all that time, one or two days at a new location.  And it was

- -

CLMT        Yeah.  It wasn't - -

| ALJ | So it was part time and - - |
| CLMT | Yeah, it was just they'd call. |
| ALJ | - - then whenever they needed you - - |
| CLMT | Yeah. |
| ALJ | - - to replace somebody. |
| WTN | Dr. Tony and Gainer provided us a lot of our medications so when they |

needed somebody Peg sort of filled in just to help them.

| ALJ | All right. |
| CLMT | That had stopped though because I just couldn't keep up. |
| ALJ | Okay. |
| CLMT | The one day that I worked I was so sweaty and everything they were |

really concerned.

| ALJ | I understand. |

*         *         *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW

JUDGE:

Q      All right.  Would you go ahead then and describe the Claimant's work in the past

15 years in terms of skills and exertional level?

A      Yes, Your Honor.  Other than the part-time job working at the MD office, which

sounds like it was part time, and perhaps not SGA, and perhaps no pay, she worked from July of

1988 until July of 2001, essentially as an LPN.  And consistent with the DOT that work would

be medium and skilled and it appears that that's - - even though she worked as a supervisor it was clarified that she was a working supervisor which meant she worked as it's described in the DOT, medium and skilled.

Q      All right.  Then let me ask you to assume a hypothetical individual the Claimant's age, educational background and work history who would be able to perform a range of light work.  Would require a sit stand option.  Could perform all postural movements occasionally except could not climb ladders, ropes, or scaffolds.  And would not be able to kneel or crawl. Should have no  - - should not be required to do any push, pull motions with the lower extremities.  Should not be exposed to temperature extremes.  Should work in a low stress environment with no production line type of pace or independent decision-making responsibilities.  Would be limited at this point to unskilled work and should not have interaction with the general public.  Would there be any work in the regional or national economy that this person could perform?

A      Yes, Your Honor, and I'll define the local regional economy as 20 percent of all unskilled jobs in the State of West Virginia according to the Department of Labor and Statistics. There would be the work of interviewer.  In the local economy there would be 224 jobs, in the national economy - - actually for some reason my stats are - -

Q      Would the interview job involve interaction with the public?

A      Yes, Your Honor.  You didn't have that as part of the - -

Q      I think that was the last thing I said.

A      Hypothetical, unskilled, okay.

Q      No interaction with the general public.

A       Excuse me.  Yes, that job would not be appropriate.  There would be work of a

mail clerk.  That would be working in private industry as opposed to working for the postal

service and there would be 85 jobs in the local economy and 79,258 in the national economy.

There would be the work of a general office clerk.  In the local economy there are 181 jobs, in

the national economy 165,819 jobs.  There would be the work of an inspector.  In the local

economy there are 131 jobs, in the national economy 140,749 jobs.

Q       And if you would reduce the exertional level to sedentary and retaining the other

limitations would there be anything that would accommodate that?

A       There would be the work of a surveillance system monitor.  In the local economy

there are 13 jobs, in the national economy 12,947 jobs.  There would be the work of a

bookkeeper accounting clerk.  In the local economy there are 62 jobs, in the national economy

71,090 jobs.  There would be the work of an assembler.  In the local economy there are 35 jobs,

in the national economy 54,794 jobs.

Q       And does anything in your testimony - - has anything in your testimony been

inconsistent with anything in the DOT?

A       No, Your Honor.

ALJ             All right.  You may inquire.

ATTY            Assume that this person suffers from both physical and mental limitations

such as chronic pain, low energy level, crying spells, frequent bathroom breaks, lapses in

concentration.  All of these things would put her off task at least a third of the working day.

How would that impact her ability to sustain employment?

VE              If an individual were off task one-third of the working day, even unskilled

work, there would be no jobs that this individual could perform.

ATTY        Thank you.

SEPTEMBER 13, 2006 HEARING

ATTY        Oh, oh, Your Honor.  There, there is an issue that we need to address here.
Her alleged on-set date has always - - it looks to me like it has remained, it has been back in
1998.

ALJ        I noticed that, yeah.

ATTY        And, and we need to amend that and I'm going to amend that or, or move
to amend that up to - -

ALJ        All right.

ATTY        - - October the 1st of 2001.

                    *              *              *

BY ATTORNEY:

Q        Now, Miss Kumpf, did you work at all after October the 1st of 2001?

A        Yes.

Q        And what did you do after October 1, '01?

A        Well, no, I take that back.  It was in July.

Q        July?

A        Yes.

Q        That's what I was - -

A        I'm sorry.

                    *              *              *

A       Yes, I haven't worked since then, no.

Q       Okay.  Now, you, you worked as a, an L, LPN?

A       Yes.


Q       All right, and you stopped - - you had done that job for quite some time?

A       Um-hum.

Q       And you stopped doing that job?

A       Um-hum.

Q       Now, why was that?

A       Well, I was replaced by an RN.

Q       Okay.

A       But, up and to that time, I was experiencing a lot of problems with pain,

especially swelling in my legs, muscle spasms and, and various complaints.

Q       Okay.  So, the - - you actually left that job because you got replaced?

A       Yes.

Q       If you hadn't been replaced, would you have been able to continue working?

A       No, I, I probably wouldn't have quit that day or been able to leave that day, but it

would have been very soon after.

Q       All right.  Now, you - - did you have any opportunities to continue working at

other jobs, after you left - - you, you were working, I think as a - -

A       Colonial Place, um-hum.

*          *          *

31

Q         - - did you have any opportunities to work at, at other jobs?

A         Yes.

Q         and can you tell me about that?

A         Yes, I had an opportunity to work for the Dr. Homers [SIC], practice with both husband and wife being doctors.

ALJ             Who is it, again?

CLMT           Dr. Joel and Terri [SIC] Homer.

ALJ             A, O?

CLMT           Uh-huh.

ALJ             All right and what did you do for them?

CLMT           I could have worked for them, I just wasn't - -

ALJ             Oh.

CLMT           - - able to keep up, you know, with the pace.  I also had the opportunity to work for Dr. Gainer.

BY ATTORNEY:

Q         Now, let me stop you for just a second.

A         Yes.

Q         Did you actually go into Dr. Homer's office and work a day or two?

A         Yes, I did.  Um-hum.

Q         Okay.

A         And it was just too much, I  - - my legs were in an awful shape with the swelling and my back hurt.

Q       All right and, and go ahead, I'm sorry for interrupting.

A       That's, okay.  Dr. Gainer and Dr. Toni, I had job offers there.  My old employment, Courtland Acres Nursing Home and Thomas offered me a job.  The Millcreek doctors' office offered me a job, there as a Nurse and also the Huttonville (Phonetic) Correctional Center.

Q       Okay.  So, well, you had all these - - and these are areas that are generally around Elkins?

A       Yes.

Q       The Elkins, West Virginia area - -

A       Um-hum.

Q       - - doctors' offices.  So, you had, it sounds like several opportunities to, to do other work?

A       Um-hum.

Q       So, why didn't you do any?  Why didn't you do it?

A       Because I wasn't physically able to.  I was experiencing a lot of pain and discomfort and a lot of swelling and nausea, pain -

Q       Think - - now did you try to go to some of those jobs?

A       I tried to go to Dr. Gainer's and Dr. Toni's and work and also Dr. Terri and Dr. Joel Homer's, too.

Q       And how many days total do you think from, from the time you left - -

A       Um-hum.

Q       - - Colonial, how many days total do you think you worked over the next year?

A       Probably two at the most or three, three at the most, I would say, yes.

Q       At, at each office or total?

A       Total, both offices, combined.

                        *              *              *

Q       Okay.  Now, Miss Kumpf, tell me in your own words, what medical problems do you have that have kept you from working since October of '01?

A       I have pain in my back, both of my legs, my arms and hands.  I have numbness and tingling.  I have numbness in the back of my head and I have nausea, and GERD.  I have sleep problems, I don't sleep at night.  I have some arthritic pain and muscle spasms and I have been told that I have Fibromyalgia and Osteoarthritis.

Q       Okay.  Let me talk to you a minute about Fibromyalgia.

A       Um-hum.

Q       Have the, the doctor, Dr. Corder, is he your main Treating Doctor?

A       Yes.

Q       Okay.  Has he attributed a lot of your problems to Fibromyalgia?

A       Yes.

Q       Okay, now, I think you're aware that there was some dispute about some doctors not diagnosing you with Fibromyalgia - -

A       Um-hum.

Q       - - and Dr. Corder was diagnosing you with Fibromyalgia.

A       Yes.

Q       Are you aware of that?

A     Yes.

Q     Okay.  Can you tell me how did Dr. Corder diagnose you with Fibromyalgia?

A     Well, he had been monitoring my symptoms.  I was having numbness and tingling and muscle spasms and pain and he had sent me to Dr. Hornsby (Phonetic) and at the time she didn't think that I had it but as time progressed, a year and a half to two years later, Dr. Corder had been doing some research and studying on Fibromyalgia, and found out that a lot of the symptoms plus I had more tender points - - at one time I had all of the tender points show up positive, so, he decided at that point that it was Fibromyalgia.

Q     Did he discuss with you how he had diagnosed that condition?

A     Yes, he told me about doing more extensive research and talking to other colleagues that, about the disease and there had been a seminar, too on it.

                    *          *          *

Q     Okay.  Now, can you tell me about on a daily - - just briefly, on a daily basis, what type of symptoms are you having from Fibromyalgia?

A     I have pain most of the time in my legs and knees and in my back, upper and lower, my neck.  I have pains in my arms and sometimes I'll drop objects when I'm picking them up.  I have pain sometimes to the point where I get sick at my stomach with it.  I don't sleep at night.  I toss and turn.  I, I don't have as much coordination or concentration and I have a lot of depression.

                    *          *          *

Q     - - are you, are you able to lift ten pounds on a, a repetitive basis, throughout a work day - -

A       No.

Q       - - eight hour workday?

A       No.

Q       Why not?

A       Because my arms are weak and I, I don't do well picking them up or holding them, either.  I have a lot of difficulty with that and just standing, holding 10 pounds my back hurts really, bad.

Q       Do, do you take any medications?

A       Yes, I do.

Q       For the, the pain symptoms that you've talked about?

A       Yes.

Q       Do they help?

A       They take the edge off but they don't completely take the pain away.

                        *                    *                    *

Q       Okay, so, okay, you mentioned that you put your, your feet up.

A       Yes.

Q       How often, well, I don't know if you - - I might be putting words in your mouth, there - - let me ask you this, do you put your feet up?

A       Yes, I do.

Q       How do you do that?

A       I usually put them up on the couch and lay down on the couch or set with them - -

Q       How often do you do that?

A       Most of the day.  I - - because they, sometimes they swell for no reason.  If I

don't, don't put them up.

                                *              *              *

Q       Okay.  Okay, now, you also mentioned that you were having depression.

A       Yes.

Q       How long has that been a problem for you?

A       For several years.

Q       Okay and have you received any treatment for that?

A       Yes.

Q       Is, is that through Dr. Chandrin?

A       Yes.

Q       Now, he's a Psychiatrist at the Appalachian Community Health Center?

A       Yes.

Q       How long have you been seeing him?

A       I've been seeing him a couple years, three years, four years.

Q       Okay.

A       Yeah, um-hum.

Q       A while, now?

A       Yes.

Q       So, are you making any progress?

A       Well, he's tried me on different anti-depressants.  Right now, I'm on Lexapro and

I'm taking the maximum amount of doses and when I go back to see him, he said he might have

to change me to another medication, which is a long process of - -

*          *          *

Q      Now we obtained and submitted to the Judge some updated treatment records from him and there was one notation in there where he said that you were busy with the, with your church.

A      Um-hum.

Q      Do you know what he meant by that?

A      I would say, he's probably referring to, I do the church cards. Like the birthday cards and the get well cards for the church (INAUDIBLE).

Q      So, if one of the members is having a birthday or - -

A      Yes.

Q      - - is in the hospital - -

A      I send that out, um-hum.

Q      - - you send that out.

A      Yes.

*          *          *

Q      Okay. And do you, I'm, I'm sure you probably - -

A      Um-hum.

Q      - - attend church services.

A      Yes, I try to. I don't make it to all of them, depending on how my health is, but - -

Q      Okay. Are, do you, are you getting up, do you get upset and down and that, that -

38

-

A       Oh, yes.  that's - - I, I think it's very discouraging because I have days where I'll just cry for no reason and it won't be anything that I can see that's causing it and that's one reason Dr. Chandrin's been upping my dose of the Lexapro, but - -

Q       Okay.  Has that changed since back in the time you were working?

A       Yes, I, I'm more, more depressed, it seems and tearful.

Q       Um-hum.  Are you more emotional?

A       Yes.  Yes.  I'll just for no reasons, will cry or - -

Q       Has your concentration, attention or memory been affected in any way?

A       Oh, yes, drastically.

Q       How has it been affected?

A       I, I can set here and talk to you and in a little bit, I might forget what I was doing or I might be going to the kitchen to get something and I'll forget what I went after and have to stop and think and maybe I won't think of it for an hour or so, but it's just - - I can't do more than one task at a time, it seems like my concentration's very limited.

*              *              *

Q       - - what, what has your daily, what have your daily activities at home been like?

A       Well, I usually get up around nine-thirty or ten and then I usually eat like a bowl of cereal and take my medicines.  I have to wait a while for them to take hold.  Then, I set down on the couch and sometimes a friend will call and I'll talk to them.  Then around lunchtime, me and my husband will go down and get the newspaper and I can get lunch, then I'll come home and, then usually fill out a card or two, and sometimes I'm able to wash a load of clothes and I

usually think about what we're fixing for supper and I'll either put it in the crock-pot or plan around something I can put in the oven to bake or put in the microwave, because now I have to set down to, to prepare his meals.

Q      Okay.  Do you drive?

A      Very limited anymore.

Q      How, how long have, has your driving been limited?

A      I would say I've seen a big decline in the last year, year, year or two years.

                    *               *               *

Q      Do you do things on a, do you do the same thing everyday?

A      Not always, I, it's, it just varies on my pain and my limitations.  I always have to take a nap in the afternoon and sometimes I spend a lot of time taking a nap.

Q      Are you able to do things when you feel like it?

A      Limited, very limited.

Q      I guess what I mean is - -

A      Um-hum.

Q      - - if, if you feel good, you may do things, if you don't feel good, you don't - -

A      Yes.

Q      - - get to do things?

A      Yes.

Q      Okay.

                    *               *               *

Q      Okay.  Now, I just kind of want to sum up here.

A       Um-hum.

Q       Tell, since back in 2001, if you had a job that allowed you to sit down and you were lifting less than 10 pounds, but you could stand up when, whenever you wanted to for a few minutes. You couldn't walk down the hall, but you had to stay there. And it was a pretty simple routine, repetitive type job, what would have kept you from doing that job?

A       My increased pain. I have to get up and move around to get the pain to go. Sometimes I have muscle spasms that I have to get up and walk to get them out. It, it just - - my days vary so much everyday and I have to have time to lay down and take my nap and, and sometimes I just feel like I'm going to faint and I have to just set down and take it easy.

Q       Would you be reliable? Would you be there everyday?

A       No. Because my pain's not reliable.

                        *                  *                  *

Q       Have you had an opportunity to review the vocational aspect of the file?

A       Yes, Your Honor.

Q       Is there any other, any information you would need about the Claimant's past, any of the past work?

A       I don't believe so, Your Honor.

Q       And would you describe her work in the past 15 years in terms of skill and exertional levels?

A       Yes, Your Honor. She worked as a, a Nurse Assistant in four different settings. According to the DOT that's, medium and semi-skilled.

Q       All right then let me ask you to assume a hypothetical individual of the

Claimant's age, educational background and work history, who would be able to perform a range of light work, would require a sit stand option. Could perform postural movements occasionally, except could not kneel, crawl or climb ladders, ropes or scaffolds. Should not do any push pull motions or activities with the lower extremities and should not do any overhead lifting or reaching. Would have, should have no exposure to temperatures extremes, should, work in a low stress environment with no production line type of pace or independent decision making responsibilities. Would be limited to unskilled work involving only routine and repetitive instructions and tasks, should have no interaction with the general public and only occasional interaction with others. Would there be any work in the regional or national economy that such a person could perform?

A       That hypothetical individual, Your Honor, at the light level, I believe could function as an office assistant, light, 150,000 nationally, 1,875 regionally and the region's West Virginia, Eastern Ohio, Western Maryland, and Western Pennsylvania or as a machine tender, light, 350,000 nationally and 2,500 regionally.

Q       And if you would reduce the level to sedentary and retain the other limitations?

A       At the sedentary level, that hypothetical individual, I believe could function as a general office clerk, sedentary, 299,000 nationally and 2,900 regionally. And also, a machine tender is at that classification also.

Q       Um-hum.

A       One hundred and forty-one thousand, nationally and fourteen hundred, regionally.

*                *                *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       Mr. Bell, if you were to add to either of these hypothetical questions that the Judge just offered, the additional limitations of, of the, the need to prop the worker's feet up to waist level, let's just say for an hour during the morning shift and an hour during the afternoon shift.  Also, during the morning shift they would have to take bathroom breaks totaling 10 to 15 minutes, per hour during the morning hours.  Would those limitations affect the availability of these jobs?

A       I don't believe that that would allow for a competitive work routine.

Q       Okay.  And why is that?

A       Well, generally not going to be able to, to prop your feet up to waist level for an hour in, two times a day and to be gone a, 15 minutes every hour, it's going to be taking you away from your work assignment too long.

Q       Normally, are you allowed 1, 15 minute break, per morning and 1 per afternoon shift?

A       Yes.  That's the normal schedule but I'm - - if there were short ones after that, that lasted a minute or 2, you could take a couple extra ones, but not the 15 minutes at a time.

Q       Okay.  How much, how many days per month could a person miss in the types of work that we're discussing here today?

A       If a person's going to miss 2 days, more than 2 days per month, the Supervisor, I think would attempt to have that corrected and if not rectified, would result in termination.

Q       How, how much, how much would an employer tolerate an employee being off-task for whatever reason, in the type of work that we're talking about here today?

A       A few, in general it depend, it depends on the worksite, but in general if it's going

to be off task more than 10 percent of the time then that's going to create problems.

Q        Okay.  Mr. Bell, I have no other questions.

ATTY        And, Your Honor, I have no other questions.

*                *                *

E.        Lifestyle Evidence

The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how claimant's alleged impairments affect her daily life:

• Takes care of personal needs and grooming (Tr. 98)

• Vacuums (Tr. 99)

• Walks dog (Tr. 140)

• Take children to school (Tr. 101, 140)

• Cleans house (Tr. 98, 140)

• Does laundry (Tr. 98, 99, 140)

• Cooks dinner (Tr. 98, 140)

• Washes dishes (Tr. 99, 140)

• Spends time with her family (Tr. 140)

• Drives car (Tr. 140)

• Takes out garbage (Tr. 140)

• Shops for groceries (Tr. 100, 140)

• Attends church (Tr. 140)

• Reads (Tr. 100, 140)

- Hobbies include sewing, painting, movies, church activities and gardening (Tr. 100)

- Claimant is 5 ft. 5 in. tall and weighs 313 lbs.

## III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant argues that the ALJ erred in not making every reasonable effort to clarify the reason for the treating physician's opinion and to resolve conflicting evidence; that the decision of the ALJ to reject the opinions of all the treating medical providers is not supported by substantial evidence; that the ALJ failed to properly evaluate Claimant's testimony concerning the intensity, duration and limiting effects of her symptoms of pain; and that the ALJ erred in improperly relying upon the vocational expert's responses to an incomplete hypothetical question.

Commissioner maintains that substantial evidence supports the ALJ's decision that Claimant could perform jobs in the national economy.  Specifically, Commissioner argues that the ALJ considered Dr. Corder's opinion and found that it was not entitled to controlling weight; that the ALJ properly weighed the medical opinions; that the ALJ properly assessed Claimant's credibility; and the ALJ properly relied upon the VE's testimony.

B.    <u>The Standards</u>.

1.    <u>Summary Judgment</u>.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party

opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587

(1986).  However, "a party opposing a properly supported motion for summary judgment may

not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242,

256 (1986).

      2.    <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive

judicial review.  <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir.

1986).

      3.    <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it

prevents her from engaging in any substantial gainful activity that exists in the national

economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

      4.    <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S.

Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

404.1508, 416.908.

      5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.　__Social Security - Standard of Review__.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.　__Social Security - Scope of Review - Weight Given to Relevant Evidence__.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.　__Social Security - Substantial Evidence - Defined__.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.　__Social Security - Sequential Analysis__.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy.  Once Claimant satisfies Steps One and Two, she will

automatically be found disabled if she suffers from a listed impairment. If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

10. <u>Social Security - Substantial Evidence - Listed Impairment</u>. In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment. <u>Cook</u>, 783 F.2d at 1168. The ALJ must identify the standard to be applied. <u>Id.</u> At 1173. The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts. <u>Id</u>.

11. <u>Social Security - Listing</u>. The ALJ must fully analyze whether a Claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met. <u>Cook</u>, 783 F.2d at 1168. <u>Cook</u> "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." <u>Russell v. Chater</u>, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[8] In determining disability, the ALJ is required to determine whether Claimant's condition is medically equal in severity to a listing. 20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3). The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence. <u>Gordon</u>, 725 F.2d 231. <u>See also</u> <u>Myers v. Califano</u>, 611 F.2d 980, 983 (4th Cir. 1980).

12. <u>ALJ's Duty to Inquire Into the Evidence</u>. "[T]he ALJ has a duty to explore all

_____

[8] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

relevant facts "[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981). See also Cook v. Heckler, 783 F2d 1168 (4th Cir. 1986). When failure to inquire into the additional evidence is prejudicial to the Claimant then the case should be remanded. Marsh v. Harris, 632 F.2d 296, 300 (4th Cir. 1980).

13. Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v.  U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

14. Social Security - Treating Physician - Opinion that Claimant is Disabled. An opinion that a claimant is disabled is not a medical opinion within the definition of 20 C.F.R. §§ 404.1527, 416.927. A statement by a medical source that Claimant is disabled or unable to work does not mean that the Commissioner will determine that Claimant is disabled. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability. Id. No special significance will be given to the source of an opinion on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

15. Social Security - Treating Physician - Speculative Opinion. An ALJ is not bound

to accept the opinion of a treating physician which is speculative and inconclusive.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

16.     Social Security - Treating Physician - Not Entitled to Controlling Weight.  When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization.  20 C.F.R. §§ 404.1527(d), 416927(d).  When benefits are denied, the ALJ must give good reasons in the notice of decision for the weight given to a treating source's medical opinion(s).  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

17.     Social Security - Claimant's Credibility.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference.  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'"  Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

18.     Social Security - Claimant's Credibility - Pain Analysis.  The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence

an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

19. Evidence Considered in Evaluating the Intensity and Persistence of Claimant's Symptoms and Determining the Extent to Which Claimant's Symptoms Limit Her Capacity for Work. The Commissioner will take into account all of the following information when assessing a Claimant's subjective complaints of pain: information that Claimant, Claimant's treating or examining physician or psychologist, or other persons provide about Claimant's pain or other symptoms; any symptom-related functional limitations and restrictions which Claimant, Claimant's treating or examining physician or psychologist, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence; all of the evidence presented, including information about Claimant's prior work record, Claimant's statements about her symptoms, evidence submitted by Claimant's treating physician or psychologist, and observations by our employees and other persons; and factors relevant to Claimant's symptoms such as, (i) daily activities, (ii) location, duration, frequency and intensity of pain and other symptoms, (iii) precipitating and aggravating factors, (iv) type, dosage and side effects of pain medication Claimant takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, Claimant receives or has received for relief of pain or other symptoms, (vi) any measure Claimant uses or has used to relieve pain or other symptoms, and (vii) other factors concerning Claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

20. Mental Disorders. The evaluation of disability on the basis of a mental disorders

requires the documentation of a medically determinable impairment(s) as well as consideration of the degree of limitation such impairment(s) may impose on the individual's ability to work and whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. 20 C.F.R. Pt. 404, Subpt P, App. 1, Listing 12.00.

21. <u>Social Security - Residual Functional Capacity</u>. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id</u>. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. <u>Id</u>. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. <u>Id</u>. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. <u>Id</u>. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. <u>Id</u>.

22. <u>Social Security - Vocational Expert</u>. Once it is established that a claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of other jobs are available in the national economy which the claimant can perform. 20 C.F.R. §§ 404.1520(f), 416.920(f).

23. <u>Social Security - Vocational Expert - Hypothetical</u>. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly

set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).

The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No.

98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[9], and need only pose those that are based

on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861

F.2d 536, 540-41 (9th Cir. 1988).

24.     Vocational Expert Purpose.  "The purpose of bringing in a vocation expert is to

assist the ALJ in determining whether there is work available in the national economy which the

particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at

*4 (4th Cir. Apr. 19, 1996).  "[R]equiring the testimony of a vocational expert is discretionary."

Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981).

25.     Social Security - Vocational Expert - Hypothetical - Claimant's Counsel.  Based

on the evaluation of the evidence, an ALJ is free to accept or reject restrictions included in

hypothetical questions suggested by a claimant's counsel, even though these considerations are

more restrictive than those suggested by the ALJ.  France v. Apfel, 87 F. Supp. 2d 484, 490 (D.

Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

C.     Discussion

1.     The ALJ Erred in Not Making Every Reasonable Effort to Clarify the Reason for
       the Treating Physician's Opinion and to Resolve Conflicting Evidence

In the prior appeal, Magistrate Judge Kaull found that the ALJ's decision to give no

weight to the opinions of Claimant's treating physician was not supported by substantial

evidence of record.  (Tr. 330).  The Court recommended on remand that the ALJ re-contact

Claimant's treating physician, Dr. Corder, for clarification of his treatment notes that were

_____

[9] See FN 8.

53

illegible. (Id.). Claimant argues that the ALJ failed to follow the District Court's order by "not making every reasonable effort to clarify the treating physician's opinion." (Cl.'s Br. P. 6-7). Claimant further argues that "because the treating physician was no longer available to clarify the evidence and resolve conflicts, the adjudicator should have arranged for a consultative exam in accordance with 20 C.F.R. 404.1519a and 416.19a and SSR 99-2p." (Id.). Claimant finds this particularly important because conflicting evidence is common in cases involving fibromyalgia. Claimant urges this Court to remand for further development in light of the fact that Dr. Corder is no longer able to clarify the reasoning behind his opinion and his opinion could help resolve the conflicting evidence regarding the diagnosis of fibromyalgia in this case.

Commissioner maintains that the ALJ complied with the regulations by re-contacting Dr. Corder and properly considering his opinion. Commissioner further argues that the ALJ was under no duty to arrange for a consultative examination in this case.

The ALJ in the instant case failed to comply with the order of the District Court. The ALJ did make an attempt to re-contact Dr. Corder. Unfortunately, however, in so doing, the ALJ learned that Dr. Corder had recently passed away. (Tr. 289). 20 C.F.R. § 404.1519(b)(4) states that a consultative examination will normally be required when "[a] conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved, and we are unable to do so by recontacting your medical source." The Undersigned finds that Dr. Corder's unfortunate passing made it impossible for the ALJ to resolve the conflict at issue by simply re-contacting him. Therefore, the Court recommends the case be remanded and a consultative examination of Claimant be had to resolve the conflicting evidence surrounding her fibromyalgia.

2.  The Decision of the Commissioner to Reject the Opinions of all the Treating Medical Providers is Not Supported by Substantial Evidence

Claimant argues that the ALJ improperly rejected the opinions of all of the treating medical sources: Claimant's long-time family physician, Dr. Corder, nurse practitioner, Mary K. Murphy, Claimant's psychiatrist, Dr. Chandron and Katie Herns, Claimant's treating therapist. Claimant also argues it was error for the ALJ to completely ignore the findings of the psychiatrist and psychologist who reviewed the psychiatric evidence for the state agency.

Commissioner correctly points out that this Court has already determined that the ALJ's analysis of Dr. Corder's opinion complied with the mandates of Social Security Ruling 96-2p. (Tr. 329). As for Ms. Murphy and Ms. Herns, Commissioner maintains that, as the ALJ discussed, neither were acceptable medical sources who were qualified to provide evidence to establish an impairment in accordance with 20 C.F.R. § 404.1513(a) (2008). (Tr. 294). Commissioner argues further that their opinions were not supported by the overall evidence and therefore it was not error for the ALJ to give them no weight. Lastly, Commissioner argues that the ALJ considered Dr. Chandran's opinion regarding Claimant's mental impairment, but his opinion that Claimant had a disabling mental impairment was inconsistent with his own treatment notes.

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id. The opinion of Claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory

evidence.  <u>Evans v. Heckler</u>, 734 F.2d 1012, 1015 (4th Cir. 1984).  Controlling weight may be

given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the

nature and severity of an individual's impairment(s), from treating sources, when the opinion is

1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2)

not inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2).

<u>See</u> <u>Craig</u>, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given

controlling weight only when it "is well supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in

the record).  While the credibility of the opinions of the treating physician is entitled to great

weight, it will be disregarded if there is persuasive contradictory evidence.  <u>Evans v. Heckler</u>,

734 F.2d 1012 (4th Cir. 1984).

   To decide whether the impairment is adequately supported by medical evidence, the

Social Security Act requires that the impairment, physical or mental, be demonstrated by

medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3);

<u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); 20 C.F.R. §§ 404.1508; <u>Throckmorton v. U.S.

Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1. (4th Cir. 1990).  Courts evaluate and

weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician

has examined the applicant; (2) the treatment relationship between the physician and the

applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion

with the record; and (5) whether the physician is a specialist.  20 C.F.R. § 404.1527 (2005).  <u>See

also</u> <u>Hines v. Barnhart</u>, 453 F.3d 559 (4th Cir. 2006).  Courts often accord "greater weight to the

testimony of a treating physician" because the treating physician has necessarily examined the

applicant and has a treatment relationship with the applicant.  <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001).

"If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record."  Social Security Ruling (SSR) 96-5p at *3.  The ALJ undertook such an analysis here.  It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner.  <u>Id</u>.  The Court's review reveals that the ALJ reasonably resolved all such conflicts and that the record more than adequately bears out his conclusions.

Claimant cites the following to support her contention that the ALJ erred by rejecting the opinions of Dr. Corder, Mary Murphy, Dr. Chandron and Katie Herns: 20 C.F.R. § 404.1527; SSR 96-2p; <u>Ward v. Chater</u>, 924 F. Supp. 53 (W.D. Va. 1996); and <u>Hines v. Barnhart</u>, 453 F.3d 559 (4th Cir. July 11, 2006).  The <u>Ward</u> court specifically adopted 20 C.F.R. § 404.1527 which states that "[i]f a treating source opinion concerning the severity of an individual's impairment is well supported by medically accepted clinical and laboratory diagnostic techniques and is consistent with other evidence, it is entitled to controlling weight.  The <u>Hines</u> court found that an ALJ is obligated to evaluate and weigh medical opinions according to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the

consistency of the opinion with the record, and (5) whether the physician is a specialist.

The Court will first address and dismiss Claimant's argument regarding the psychiatrist and psychologist who reviewed the psychiatric evidence for the state agency. The Claimant directs the Court to the Mental RFC performed in March, 2005 (Tr. 479-96) and the Psychiatric Review Technique performed in December, 2005. (Tr. 655-72). It is clear from the law cited by the Claimant that these reviews are not entitled to any weight. As for Claimant's argument that the ALJ erred by not indicating the weight he gave these reviews, it is apparent that the ALJ's failure to include them in his decision leads this Court to believe that he gave them no weight whatsoever. A further look into the ALJ's decision reveals that "no longitudinal medical evidence of record indicates that the claimant has been the victim of any totally incapacitating mental illness. Rather, she has remained highly functional and involved in volunteer work and her church." (Tr. 295). The ALJ reached this conclusion after evaluating the record and opinions of all of Claimant's treating physicians/nurses, etc. Therefore, the ALJ did not err by rejecting the opinions of the state agency psychiatrist and psychologist.

As for Ms. Murphy and Ms. Kerns, the ALJ discussed and considered their opinions of in his decision. (Tr. 293-94). Neither were acceptable medical sources who were qualified to provide evidence to establish an impairment in accordance with 20 C.F.R. § 404.1513(a) (2008). Furthermore, their opinions were not supported by the overall evidence; therefore, the ALJ did not accord them any weight.

The ALJ considered Dr. Chandran's opinion regarding Claimant's mental impairment. As the ALJ discussed, Dr. Chandran's opinion that Claimant had a disabling mental impairment was inconsistent with his own treatment notes. (Tr. 294-95). Therefore, the decision of the

Commissioner to reject the opinions of treating medical providers discussed above was

supported by substantial evidence

3.      The ALJ Failed to Properly Evaluate Claimant's Testimony Concerning Intensity,
        Duration and Limiting Effects of Her Symptoms of Pain

Claimant argues that the ALJ failed to properly evaluate her testimony concerning the

intensity, duration and limiting effects of her symptoms of pain.  Specifically, Claimant argues

that the ALJ failed to follow the two-step process used to determine whether a claimant is

disabled by pain under 20 C.F.R. § 416.929(b), SSR 96-7p, 1996 WL 374186 (July 2, 1996) and

Craig v. Chater, 76 F.3d 595  Commissioner maintains that the ALJ properly assessed

Claimant's credibility.

The determination of whether a person is disabled by pain or other symptoms is a two

step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by

objective medical evidence an impairment capable of causing the degree and type of pain

alleged.  Second, once this threshold determination has been made, the ALJ must consider the

credibility of her subjective allegations of pain in light of the entire record.  Craig v. Chater, 76

F.3d 585 (4th Cir. 1996).

In this case the ALJ correctly applied the Craig test. The ALJ found that Claimant "had

medically determinable impairments during the 'initial period at issue' that could reasonably be

expected to produce some of the symptoms that she has alleged."  (Tr. 288).  This satisfies the

first prong of the  Craig test.  The ALJ then considered Claimant's credibility in light of the

entire record.  The ALJ found that "the claimant's hearing testimony and other attributed

statements of record concerning the intensity, persistence and limiting effects of her impairment-

related symptoms...are not entirely credible."  (Id.).  Specifically, the ALJ pointed out that

Claimant continues to care for her husband and children, drives, prepares meals, loads a dishwasher, folds laundry, goes shopping, spends time with others and is actively involved with her church. The ALJ also noted that he has had two opportunities to hear and observe Claimant's testimony and demeanor at a hearing and to review all of the evidence of record. (Tr. 289). The ALJ also noted that Claimant's "subjective complaints have progressively escalated and expanded in scope as she has invested herself in the compensable disability process." (Tr. 290). The ALJ found that claimant has "significantly exaggerated the debilitating severity of her impairment-related limitations in order to facilitate secondary interests." (Tr. 292). The ALJ concluded that Claimant retains the ability to perform a range of "unskilled" work activity. (Tr. 287). The ALJ considered Claimant's subjective complaints of pain in light of the entire record in accordance with the second prong of <u>Craig</u>. Therefore, the ALJ properly assessed Claimant's credibility as to her subjective complaints of pain.

4.   <u>The ALJ Erred in Improperly Relying Upon the Vocational Expert's Responses to an Incomplete Hypothetical Question</u>

Claimant contends that the ALJ posed an improper hypothetical to the vocational expert (VE). Specifically, Claimant asserts that the ALJ's hypothetical was based on an RFC that included no limitations to her ability to maintain regular attendance and complete a normal work day and week. Claimant maintains that she is unable to maintain a regular work schedule due to her impairments. Commissioner maintains that the hypothetical question to the VE was proper and that there is no requirement that a hypothetical question list "every impairment alleged by a claimant." <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005).

The Claimant's contention that the ALJ failed to pose a hypothetical that reflected all of Claimant's limitations is without merit. In questioning a VE, the ALJ must propound

hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on Claimant's impairment. Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989). It is clear that not all of the questions assumed all of the impairments Claimant was asserting. With the exception of the issue surrounding Claimant's fibromyalgia, which Claimant does not assert as the cause of her inability to maintain a normal work week, the ALJ properly considered the medical evidence of record when determining that the Claimant did not evidence any combination of debilitating, impairment-related psychological symptoms that imposed any more than "mild" limitation upon her social functioning or ability to carry out daily activities. (Tr. 287). The ALJ also properly considered the medical evidence regarding Claimant's mental status when determining her RFC.

Claimant stated that she had "deep depression" at her May 2004 hearing. However, the ALJ noted that the Claimant "alleged no debilitating psychological symptomatology whatsoever in conjunction with her March 2003 disability benefit application. (Tr. 290). The ALJ noted that the Claimant alleged her total disability since February 21, 1998, but had continued to work for more than three years thereafter. (Id.). At an April 28, 2003 psychological evaluation, Claimant offered that she had been depressed "since 1993." (Tr. 138-141). The ALJ found this contraindicative to the presence of any intractable, inherent, longstanding and totally disabling mental illness because the Claimant continued to work until 2001 when she was "fired" and replaced by a registered nurse. (Tr. 292). The ALJ also noted that the Claimant has historically required no ongoing mental health intervention. (Id.).

The hypothetical presented to the vocational expert was based on Claimant's RFC, which took into account all of Claimant's mental limitations. Specifically, the ALJ asked the VE

whether jobs existed in the national economy for an individual of Claimant's age, education and vocational profile with occasional posturals and a sit or stand option during the course of the day. (Tr. 752). The VE testified that, assuming the hypothetical individual's specific work restrictions, she is capable of making a vocational adjustment to other work, including performing the following jobs at the light level: office assistant (with 150,000 jobs nationally and 1,875 regionally); machine tender (with 350,000 jobs nationally and 2,500 regionally); and the following jobs at the sedentary level: general office clerk (with 299,000 jobs nationally and 2,900 regionally); and machine tender (with 141,000 nationally and 1,400 regionally. (Tr. 753).

As was previously mentioned, the ALJ took into account all of Claimant's limitations and discounted the credibility of Claimant's subjective allegations of pain. Therefore, the hypothetical that was posed to the vocational expert was proper.

### IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **<u>GRANTED IN PART</u>** and **<u>DENIED IN PART</u>**.  Claimant's motion should be granted solely on the issue of the ALJ's failure to re-contact Dr. Corder, and the case **<u>REMANDED</u>** with instructions that a consultative examination of Claimant be had to resolve the conflicting evidence surrounding her fibromyalgia.  Claimant's motion should be denied as to the following issues because the ALJ's decision was supported by substantial evidence: 1) The Decision of the Commissioner to Reject the Opinions of all the Treating Medical Providers; 2) The ALJ Failed to Properly Evaluate Claimant's Testimony Concerning Intensity, Duration and Limiting Effects of Her Symptoms of Pain; and 3) The ALJ Erred in Improperly Relying Upon the Vocational Expert's Responses to

an Incomplete Hypothetical.

2.      Commissioner's Motion for Summary Judgment be **GRANTED IN PART** and **DENIED IN PART** as set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: January 30, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE